# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

| | |
|---|---|
| Ma Amba Minnesota, Inc., *a Minnesota corporation d/b/a Countryside Motel*,<br><br>Plaintiff,<br><br>v.<br><br>Cafourek & Associates, Inc., *a Minnesota corporation*, and Auto-Owners Insurance Company,<br><br>Defendants.[1] | Case No. 18-cv-680 (SRN/TNL)<br><br><br>**MEMORANDUM OPINION AND ORDER** |

Dustin C. Jones and Ken D. Schueler, Dunlap & Seeger, PA, 30 Third Street, Suite 400, Rochester, MN 55904 for Plaintiff.

Aaron M. Simon, Brownson Norby, PLLC, 225 South Sixth Street, Suite 4800, Minneapolis, MN 55042 for Defendant Cafourek & Associates.

William R. DeJean, Nielsen & Treas, LLC, 3838 North Causeway Boulevard, Suite 2850, Metairie, LA 70002, and Brock P. Alton, Gislason & Hunter LLP, 701 Xenia Avenue, Suite 500, Minneapolis, MN 55416 for Defendant Auto-Owners Insurance Company.

SUSAN RICHARD NELSON, United States District Judge

In November 2007, Plaintiff Ma Amba Minnesota, Inc. ("Ma Amba") purchased a motel in Albert Lea, Minnesota, and, in so doing, took over the flood insurance policy of the motel's prior owner. Although Ma Amba did not realize it at the time, this flood insurance

---

[1] Although Auto-Owners Insurance Company is still listed as a defendant on the docket, Ma Amba settled its claims against Auto-Owners in November 2018. (*See* Doc. No. 48.) Its presence is accordingly irrelevant for purposes of this motion.

policy only provided coverage for one of the motel's four buildings. Unaware of this condition, Ma Amba renewed the prior owner's insurance policy on an annual basis, always through Defendant Cafourek & Associates, Inc. ("Cafourek"), its local insurance agent. About a decade later, though, in September 2016, a flood damaged *two* of the motel's buildings. It was only then that Ma Amba learned about the policy's "one building" limitation. Displeased at this situation, and seeking to recover its unclaimed losses, Ma Amba decided to sue Cafourek for negligence. In essence, Ma Amba argued that Cafourek, without prompting, should have told it about the "one building" limitation at some point between November 2007 and September 2016.

Cafourek now moves for summary judgment. Ma Amba opposes the motion. Because the Court finds that Cafourek had no affirmative duty to inform Ma Amba of any inadequacies in the at-issue insurance policy, and because no reasonable juror could find that Cafourek otherwise acted negligently toward Ma Amba, the Court grants Cafourek's motion.

## I. BACKGROUND

### A. The Parties

Plaintiff Ma Amba is a Minnesota corporation that owns only one asset: the Countryside Motel in Albert Lea, Minnesota. (*See* A. Patel Dep. [Doc. No. 46-1] at 11.) Ma Amba, in turn, is owned by a married, college-educated couple named Abhi Patel (the husband) and Falguni Patel (the wife). (*See id.* at 11-12; *see also* A. Patel Dec. [Doc. No. 51] ¶ 5 (noting that he earned a B.S. from Gujarat University in India in the 1980s with a major in physics); F. Patel. Dec. [Doc. No. 52] ¶ 3 (noting that she earned a B.S. from Gujarat University with a major in business administration and accounting).) The Patels live in Haines

2

City, Florida, and have worked in the motel business for decades. (*See* A. Patel Dep. at 5, 8; *accord* F. Patel Dep. [Doc. No. 46-2] at 6-7.) Moreover, since 2005, the Patels have personally owned and operated at least five motels, spread across four states. (*See* A. Patel Dep. at 9, 111-12.) Currently, the Patels own three motels, including the Countryside Motel (*see id*. at 8), and have incorporated each of those motels into a separate corporation (*see id*. at 11). Abhi Patel is "in charge of purchasing insurance" for the Patels' motels. (*Id*. at 12.) And, over the years, he has purchased insurance for a variety of properties, and through a variety of agents. (*See id*. at 30-33.)

Defendant Cafourek & Associates is an insurance agency based in Albert Lea, Minnesota; it has been in business since 1989. (*See* Ryan Cafourek Dep. [Doc. No. 46-4] at 7-8.) At all relevant times, Ryan Cafourek was one of the agency's owners (*see id*. at 15), and Terin Smith-Bangert was an agent/customer service representative working beneath Mr. Cafourek (*see* Smith-Bangert Dep. [Doc. No. 46-3] at 11-13).

### B. Factual History

The facts in this case are neither complicated nor disputed in any material way. From an unknown point in time until November 2007, a man named Jay Bhakta owned the Countryside Motel. (*See* A. Patel Dep. at 18-19; Cafourek Dep. at 22-24.) Mr. Bhakta maintained an Auto-Owners Insurance flood insurance policy on the motel, which he had purchased through a (former) Cafourek agent named Rajesh Bhakta (no relation). (*See* Cafourek Dep. at 21-24; Smith-Bangert Dep. at 35-36.) However, for somewhat unclear reasons, Mr. Jay Bhakta only maintained flood insurance on one of the four buildings that

3

comprised the Countryside Motel. (*See* Cafourek Dep. at 37.)[2] Apparently, both Mr. Bhakta and Mr. Cafourek were aware of this oddity, because of flooding that damaged two buildings in the "early 2000s." (*See id.* at 36-38.) As Mr. Cafourek recalled during his deposition, even after this "early 2000s flood," Mr. Bhakta did not once "complain" to Cafourek about his flood insurance policy. (*Id.* at 37.)

Several years later, in November 2007, Mr. Bhakta sold the Countryside Motel to Abhi Patel/Ma Amba, in what was essentially a hand-shake deal. (*See* A. Patel Dep. at 18-22 (explaining that he had "never seen" Mr. Bhakta before this purchase, and that he bought the motel "without much discussion" or "negotiation").) In arranging this transaction, the two men discussed neither flood insurance nor the earlier flooding incident. (*See, e.g.*, *id.* at 20-21 (Q: Were there any discussions with Mr. Bhakta about insurance? A: No. . . . Q: Did Mr. Bhakta have any conversations with you about any flooding at the motel prior to you purchasing it? A: No.").)

Shortly thereafter, Mr. Cafourek reached out to the Patels and asked if they wanted to continue using Cafourek & Associates for the Countryside Motel's insurance needs (of which flood insurance was just a part). (*See* Cafourek Dep. at 27-28.) Mr. Patel agreed to continue working with Cafourek (*see* A. Patel Dep. at 22-25), and, with respect to flood insurance, simply requested that Cafourek provide Ma Amba "the same thing [Mr. Bhakta] had" (Cafourek Dep. at 28, 44). At Mr. Cafourek's instruction, then, Ms. Smith-Bangert transferred

---

[2] Mr. Cafourek speculated that Mr. Bhakta did this because two of the motel's buildings sit on "much higher" ground than the other two buildings, and because one of the two lower-lying buildings is simply a storage shed. (*See* Cafourek Dep. at 42-43.)

4

Mr. Bhakta's flood insurance policy into Ma Amba's name. (*See* Smith-Bangert Dep. at 37-43; *see also* Defs.' Ex. 6-8 [Doc. Nos. 46-4 to 46-7] (transfer documentation).) Importantly, all parties agree that, during these initial conversations in 2007 and 2008, the Patels did not ask Cafourek any questions about the policy, and Cafourek, in turn, did not inform the Patels that the flood insurance policy only covered one building. As best the Court can tell, the parties did not discuss the issue at all. (*See* A. Patel Dep. at 23-26; F. Patel Dep. at 9-11; Cafourek Dep. at 28-29.) Moreover, in the ensuing years, Mr. Patel did not discuss his flood insurance with anyone employed at Cafourek in any substantive manner. (*See, e.g.*, A. Patel Dep. at 25 ("Q: Prior to the flooding and the flood claim at the motel in Albert Lea, Minnesota, were there any communications with Ryan [Cafourek] or Terin [Smith-Bangert] about flood insurance at the motel? A: No.").) Rather, on an annual basis, Mr. Patel would simply call Ms. Smith-Bangert to renew the policy at whatever dollar amount he desired for that year, and she would follow his instructions. (*See* Smith-Bangert Dep. at 50-51; A. Patel Dep. at 25-30, 106-07.)[3]

On September 22, 2016, nearly a decade after Ma Amba took over Mr. Bhakta's policy, a flood from the nearby Albert Lea lake caused damage to two of the Countryside Motel's four buildings: a "structure that had the office and [some] guest rooms," and a

---

[3]    Although the issue never arose during Mr. Patel and Ms. Smith-Bangert's (brief) renewal conversations, it is not disputed that, at the time of these conversations, Ms. Smith-Bangert (unlike her boss) was *not* aware that Ma Amba's flood insurance policy only covered one of the motel's four buildings. (*See* Smith-Bangert Dep. at 57.)

5

"garage/shed." (*See* A. Patel Dep. at 34-35.)[4] When Mr. Patel called Cafourek to inquire about his insurance coverage, he learned, to his surprise, that Ma Amba's flood insurance policy would only cover one of the two damaged buildings. (*See* A. Patel Dec. ¶¶ 15-16.) Mr. Patel was surprised by this news because, up until this incident, he had believed that that the policy covered all four buildings. (*See* A. Patel Dep. at 54.) This belief stemmed entirely from Mr. Patel's assumption that his policy *should have* covered his entire motel (based on his interpretation of the policy "declaration page," which did not address the question one way or the other), and from Cafourek's supposed "failure" to inform him or his wife to the contrary. (*Id.*; *accord* F. Patel Dec. ¶¶ 15-16.) However, neither Patel alleges that anyone from Cafourek affirmatively told them that the policy covered all four buildings in the motel; again, it appears that the issue was simply not discussed. (*See also* A. Patel. Dep. at 102 (further emphasizing that, prior to the September 2016 flood, "nobody told [him] anything" about his insurance policy).)

As such, following the September 2016 flood, Ma Amba applied for (and received) coverage for the damage caused to the "structure that had the office and [some] guest rooms," but *not* for the damage caused to the "garage/shed." (A. Patel Dep. at 34-35.) This discrepancy

---

[4] Although the record is not entirely clear on this front, it appears that the two buildings damaged in this 2016 flood were the same two buildings damaged in the "early 2000s flood."

left Ma Amba with an unpaid insurance claim of approximately $18,000. (*See* Def.'s Ex. 5 [Doc. No. 59-5] at 6 ("Garage/Shed Insurance Claim").)[5]

### C. Procedural History

On March 9, 2018 Ma Amba filed this lawsuit against Cafourek and Auto-Owners Insurance Company (the provider of the policy). (*See* Compl. [Doc. No. 1]; *see also supra* at n.1.) In Ma Amba's complaint against Cafourek, which it amended on May 31, 2018, Ma Amba asserted claims of negligence, "reformation of flood insurance policy," equitable estoppel, and "declaratory judgment." (*See* Am. Compl. [Doc. No. 28] ¶¶ 45-67.) On November 20, 2018, following discovery, Cafourek moved for summary judgment. The parties then submitted full briefing on the matter. (*See* Def.'s Br. in Support of Summ. J. [Doc. No. 45] ("Def.'s Br."); Pl.'s Br. in Opp. to Summ. J. [Doc. No. 55] ("Pl.'s Opp. Br."); Def.'s Reply Br. [Doc. No. 60].) Following this briefing, but before oral argument, Ma Amba withdrew its "reformation of flood insurance policy," equitable estoppel, and "declaratory judgment" claims, leaving only the one count of negligence. (*See* Jan. 10, 2019 Letter [Doc. No. 61].) The Court then heard oral argument on January 11, 2019.

## II. DISCUSSION

Summary judgment is proper if there are no disputed issues of material fact and the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a). Put differently, a moving party is entitled to summary judgment when "no reasonable jury could

---

[5] Although not relevant for purposes of the present motion, the Court notes that Cafourek has submitted an expert report disputing the amount of this loss. (*See* Def.'s Ex. 5 [Doc. No. 59-5] at 1-3 ("Nonhof Expert Report").)

find the facts necessary to entitle the non-moving party to relief." *Johnson v. Wells Fargo Bank, N.A.*, 744 F.3d 539, 541-42 (8th Cir. 2014) (cleaned up).

### A. The Legal Standard for Negligence

The parties agree that Minnesota law applies to Ma Amba's negligence claim. As such, in applying Minnesota law, the Court will "predict how the Supreme Court of Minnesota would rule [on the facts of this case], and . . . [will] follow decisions of the intermediate state court when they are the best evidence of Minnesota law." *Sletten & Brettin Orthodontics, LLC v. Continental Cas. Co.*, 782 F.3d 931, 934 (8th Cir. 2015).

To maintain a claim of negligence against an insurance agent, Minnesota law requires a plaintiff to prove four elements: (a) the existence of a duty, (b) breach of the duty, (c) causation, and (d) damages. *See Johnson v. Urie*, 405 N.W.2d 887, 891 (Minn. 1987). The element most at-issue here is the first element, "the existence of a duty." "The existence of a duty is a question of law for court determination." *Id.* at 891 n.5; *accord Klimstra v. State Farm Auto Ins. Co.*, 891 F. Supp. 1329, 1337 (D. Minn. 1995).

In the insurance agent context, the Minnesota Supreme Court has held that, by and large, the only legally-enforceable duty that an insurance agent owes to its customers is the duty "to act in good faith and follow instructions." *Gabrielson v. Warnemunde*, 443 N.W.2d 540, 543 (Minn. 1989); *accord Nelson v. Am. Family Mut. Ins. Co.*, 262 F. Supp. 3d 835, 858 (D. Minn. 2017). In other words, "[a]bsent an agreement to the contrary, an agent has no duty beyond what he or she has specifically undertaken to perform for the client," and thus "is under *no affirmative duty* to take other actions on behalf of a client," *Gabrielson*, 443 N.W.2d at 543, such as "offering, furnishing, or advising regarding insurance coverage," *Beauty*

8

*Craft Supply & Equip. Co v. State Farm Fire & Cas. Ins. Co.*, 479 N.W.2d 99, 101 (Minn. Ct. App. 1992). Consequently, in the usual course of business, a plaintiff cannot hold an insurance agent liable for negligence based solely on a sin of "omission." *See Ruberg v. Skelly Oil Co.*, 297 N.W.2d 746, 750 (Minn. 1980) ("An omission constitutes negligence only where there is a duty to act affirmatively."). This limitation on insurance agent liability exists because, "generally, an insurance customer is responsible to educate himself concerning matters of insurance coverage." *Louwagie v. State Farm Fire & Cas. Ins. Co.*, 397 N.W.2d 567, 569 (Minn. Ct. App. 1986).

However, in *Gabrielson*, the Minnesota Supreme Court also established that "if 'special circumstances' are present in the agency relationship," "the insurance agent *may* possibly be under a duty to take some sort of affirmative action, rather than just follow the instructions of the client." *Gabrielson*, 443 N.W.2d at 543-44 (emphasis added). Although this "special-circumstances doctrine" "is not well defined," and "courts have found a factual basis for applying the doctrine in only a few cases," *Prairie Wild Enter., Inc. v. Bofferding*, No. A10-734, 2011 WL 891074, at *4 (Minn. Ct. App. Mar. 15, 2011), it is clear that the following factors are "relevant" in determining whether "special circumstances" exist: "**(1)** if the agent knew that the insured was unsophisticated in insurance matters, **(2)** if the agent knew that the insured was relying on the agent to provide appropriate coverage, [and] **(3)** if the agent knew that the insured needed protection from a specific threat," *Okrakene v. Governing Bd. of Directors of Minn. FAIR Plan*, No. A07-1454, 2008 WL 3897185, at *3 (Minn. Ct. App. Aug. 26, 2008) (citing *Gabrielson*, 443 N.W. 2d at 544). Courts also consider **(4)** whether "the insured ask[ed] the agent to examine the insured's exposure and advise the

insured on the potential exposure," *Scottsdale Ins. Co. v. Transport Leasing/Contract, Inc.*, 671 N.W.2d 186, 196 (Minn. Ct. App. 2003), and **(5)** whether "the insured delegate[d] decision-making authority to the agent and the agent acts as an insurance consultant," *Beauty Craft Supply*, 479 N.W.2d at 101-02.

Although expert testimony may be helpful in determining whether "special circumstances" justify imposing a heightened duty of care on an insurance agent, the court ultimately bears responsibility for deciding whether such a duty exists. *See Gabrielson*, 443 N.W.2d at 545 ("The testimony of the experienced insurance agent that [defendant] did not exercise the necessary skill and care in renewing [plaintiff's] policy, while important in establishing a standard of care, does not by itself establish a legal duty to exercise that care for the benefit of the insured."); *accord Klimstra*, 891 F. Supp. at 1337.

### B. Analysis

The Court's analysis will proceed in two parts. First, the Court will decide what duty of care the law imposed on Cafourek. Second, the Court will decide if any material disputes of fact exist as to whether Cafourek breached that duty of care in its dealings with Ma Amba, such that a reasonable juror could potentially hold Cafourek liable for negligence.

#### 1. *Applicable Duty of Care*

As an initial matter, the Court finds that no "special circumstances" exist that would justify imposing a heightened duty of care on Cafourek. Accordingly, the only duty of care Cafourek owed Ma Amba was the duty "to act in good faith and follow instructions." *Gabrielson*, 443 N.W.2d at 543. This conclusion flows directly from a straightforward application of the five "relevant considerations" detailed above.

***First***, there is no indication that Ma Amba's owners, the Patels, were "unsophisticated in insurance matters," much less that Cafourek "*knew*" the Patels to be unsophisticated in such matters. *Okrakene*, 2008 WL 3897185, at *3. The Patels are college educated business people who have owned and operated multiple motels in multiple states. Mr. Patel has been purchasing commercial insurance policies for his family's motels since at least 2005, and from a variety of insurance agents. And nothing about the Patels would have given Cafourek any indication that they needed special assistance. As such, no reasonable juror could find for the Patels on this factor. *Compare Osendorf v. Am. Family Ins. Co.*, 318 N.W.2d 237, 238 (Minn. 1982) (finding that farmer "with only an eighth grade education," and who "could not read most of the language in the insurance policy," *was* an unsophisticated insurance consumer, and that the farmer's (longstanding) insurance agent was thus under a duty to inform the farmer that his existing liability policy failed to cover most of his employees) *with Okrakene*, 2008 WL 3897185, at *5 (finding that landlord was *not* an "unsophisticated insurance customer" because he had "an undergraduate business degree and two masters degrees, own[ed] and manage[d] multiple rental properties and [had] also used various other insurance providers for his other properties in the past").[6]

---

[6] Admittedly, *Osendorf* preceded *Gabrielson*, and hence did not discuss the "special-circumstances doctrine." However, multiple Minnesota Court of Appeals decisions have since cited *Osendorf* as the paradigmatic example of an "unsophisticated insurance consumer," in which the "special-circumstances doctrine" might apply. *See, e.g., Philter, Inc. v. Wolff Ins. Agency*, No. A10-2230, 2011 WL 2750709, at *4 (Minn. Ct. App. July 18, 2011) (finding that plaintiff was not an "unsophisticated insurance customer" because, "even though [plaintiff] was a new employer, he graduated from high school, attended North Dakota State University for approximately one-and-a-half years, and had business-management experience," and further observing that plaintiff's "circumstances [were] much different from those of the insured in *Osendorf,* a barely

11

***Second***, nothing in the record suggests that Cafourek should have been on notice that the Patels were "relying on [Cafourek] to provide appropriate coverage." *Okrakene*, 2008 WL 3897185, at *3. Although Ma Amba contends that such "reliance" existed here, namely, because "the Patels always relied on their insurance agents, including Cafourek, to provide them with adequate insurance coverages for their motels" (Pl.'s Opp. Br. at 18), that argument is unavailing. The question is not whether the Patels *believed* that they were relying on Cafourek to provide them with the best insurance coverage possible, but, rather, whether *objective circumstances* could have put Cafourek on notice that the Patels had placed such "reliance" on its agents.

Here, all Cafourek knew about the Patels was that they were out-of-state motel owners, and that they only used Cafourek with respect to their Countryside Motel insurance needs (as opposed to their other business or personal insurance needs). Moreover, there is no evidence that either Patel held a particularly close relationship with anyone at Cafourek; in fact, Mr. Patel conceded at his deposition that he had only met Mr. Cafourek "two or three times" in person, and that his phone/e-mail "interactions" with Cafourek employees were "limited." (A. Patel Dep. at 27.) Consequently, no reasonable juror could find that Cafourek should have known that the Patels placed "great reliance" in them when it came to flood insurance. *See Gabrielson*, 443 N.W.2d at 545 (stating that "great reliance" not present where insured "did not place all of his insurance needs into the hands of [one agent] but rather, used another

---

literate farmer who had difficulty reading the insurance material and, as a result, had to rely on his agent to help select the appropriate coverage"); *Prairie Wild*, 2011 WL 891074, at *4 (employing similar reasoning).

insurance agent as well"); *AgCountry Farm Credit Servs., ACA v. Elbert*, No. A17-1413, 2018 WL 2090617, at *3 (Minn. Ct. App. May 7, 2018) (same); *Prairie Wild*, 2011 WL 891074, at *4 (same); *cf. Carlson v. Mut. Serv. Ins.*, 494 N.W.2d 885, 886-88 (Minn. 1993) (finding special circumstances where agent and insured had familial relationship, celebrated holidays and family gatherings together, and insured relied on agent for all insurance needs and for insurance advice).

***Third***, although Mr. Cafourek knew that the Countryside Motel faced a "specific threat" of flooding underinsurance, based on his experience with the "early 2000s flood," there is no evidence that anyone at Cafourek should have known that the Patels wanted greater "protection from [this] specific threat," than that desired by Mr. Bhakta (the prior owner). *Okrakene*, 2008 WL 3897185, at *3. Put simply, the Patels requested a certain kind of commercial flood insurance coverage – "the same thing [Mr. Bhakta] had" – and Cafourek provided them with that coverage. (*Supra* at 4.) That was the extent of the parties' discussion on the matter. Indeed, by their own admission, the Patels never asked a single question about the nature of their flood insurance policy, at either the time of purchase or in the years afterwards. (*See id.* at 4-5.) Under these circumstances, it is hard to see why Mr. Cafourek (or anyone working at Cafourek) should have assumed that the Patels wanted a different flood insurance policy than the one they asked for, especially since the only indication of "underinsurance" had arisen years prior, and without complaint from the motel's then-insurance holder. (*Compare* Pl.'s Opp. Br. at 18 (stating, without any citation to the record, that "Cafourek knew of the flood in the early 2000s that resulted in the prior owner of the Countryside Motel having flood insurance coverage *problems*") (emphasis added) *with supra*

13

at 3-4 (stating that, according to Mr. Cafourek's deposition testimony, "even after this 'early 2000s flood,' Mr. Bhakta did not once 'complain' to Cafourek about his flood insurance policy").) Moreover, as Mr. Cafourek noted at his deposition, the Patels, like Mr. Bhakta before them, arguably had sound business reasons for maintaining a "one building" policy. (*See supra* at n.2; *see also* Defs.' Reply Br. at 17 (arguing that it was "proper and financially responsible" to "set up the flood insurance for the motel," so as to avoid "pay[ing] thousands of dollars a year in premium[s] to have flood insurance on a garage, when flooding would only cause minimal damage to the garage").)

As such, no reasonable juror could find that Cafourek should have known that the Patels needed, or even wanted, protection from the "specific threat" of flooding underinsurance. *Cf. Timeshare Sys., Inc. v. Mid-Century Ins., Co.*, No. A12-0816, 2012 WL 5896834, at *4 (Minn. Ct. App. Nov. 26, 2012) (observing that a commercial building owner "was not relying on [his insurance agent] to provide protection from a *particular* threat," because the owner "asked only for a policy that provided coverage identical to that of [a] previous policy" the owner had bought from the agent).

*Fourth*, the record plainly demonstrates that the Patels did not "ask" Cafourek to either "examine [their] exposure," or to "advise [them] on [their] potential exposure." *Scottsdale*, 671 N.W.2d at 196. As noted above, when it came to flood insurance, the Patels simply asked Cafourek to provide them "the same thing [Mr. Bhakta] had," and otherwise made no inquiries about their policy, or about their potential exposure to flooding. Indeed, at his deposition, Mr. Patel confirmed that Ma Amba did not pay Cafourek any "additional amounts" for "consulting" or "risk management." (A. Patel Dep. at 25-26.) This case is thus

a far cry from *Scottsdale*, in which the Minnesota Court of Appeals denied the insurance agent summary judgment on the question of "special circumstances." There, an insurance agent specifically undertook the complex task of determining what kind of driver liability policy to procure for a large, nationwide trucking corporation, with which the agent had an "ongoing [business] relationship," and the corporation then relied on the agent's (arguably erroneous) advice in purchasing its liability policy, over the recommendation of a different insurance advisor. *See generally Scottsdale*, 671 N.W.2d at 188-93, 196. The agent's erroneous advice ended up costing the trucking corporation tens of millions of dollars. *See id*. at 192. Suffice it to say, the circumstances of this case are nothing like that.

***Fifth***, for the reasons articulated in the prior paragraph, no reasonable juror could find that the Patels "delegate[d] decision-making authority to" Cafourek so that they could "act[] as an insurance consultant." *Beauty Craft Supply*, 479 N.W.2d at 101-02; *see also* A. Patel Dep. at 12, 30 (confirming that he was "in charge of purchasing insurance" "for the motels [him and his wife] owned," and that he "didn't go to [Cafourek] and say, 'give me whatever you want, you take care of it'").

***Finally***, because expert testimony alone cannot be used to create a heightened duty of care than is not otherwise justified under Minnesota law, the Court finds the declaration of Ma Amba's expert witness, Mr. Robert Mahowald, unavailing on this issue. (*See* Mahowald Dec. [Doc. No. 56].)

For these reasons, the Court finds that Cafourek was subject to the "ordinary" insurance agent duty of care described in *Gabrielson*.

## 2. *Whether a Reasonable Juror Could Find That Cafourek Breached Its Duty of Care to Ma Amba*

The only remaining question, then, is whether Cafourek "acted in good faith and follow[ed] [Ma Amba's] instructions." *Gabrielson*, 443 N.W.2d at 543; *see also Scottsdale*, 671 N.W.2d at 196 ("Unless there is a special circumstance or relationship, the agent's duty is to act in good faith and to simply follow the instructions of the insured."). There is no dispute that Cafourek followed Ma Amba's instructions, in that it purchased the flood insurance policy Mr. Patel requested, and then renewed that policy on an annual basis in the amount desired by Mr. Patel. (*See supra* at 4-5.) However, Ma Amba contends, a reasonable juror *could* find that Cafourek "did not act in good faith towards Ma Amba" because "Ryan Cafourek had knowledge of the prior flood and flood coverage problem but failed to inform Abhi and Falguni Patel of this information." (Pl.'s Opp. Br. at 15-16.)

The Court disagrees. Although the meaning of "good faith" has never been discussed in the context of a negligence action against an insurance agent, Minnesota courts generally only find that a party acted in *bad* faith when they engage in "conduct that is dishonest or malicious or otherwise in subjective bad faith." *BP Prods. N. Am., Inc. v. Twin Cities Stores, Inc.*, 534 F. Supp. 2d 959, 966 (D. Minn. 2007) (collecting citations); *accord Nelson*, 262 F. Supp. 3d at 854. No evidence in the record supports such a finding here. At worst, it appears, Cafourek committed an unfortunate oversight by failing to inform the Patels prior to September 2016 that Ma Amba's flood insurance policy did not cover all of the Countryside Motel's buildings. But making a mistake, or otherwise performing in a manner that is not commensurate with the highest standards of the insurance industry, does not subject an

insurance agent to negligence liability. *See Gabrielson*, 443 N.W.2d at 545 ("If [an insurance agent] [feels] an obligation to perform his duties at a higher level of skill and competence, that is commendable, but he should not be legally held to that standard of conduct – unless he holds himself out as a person exercising greater levels of skill and care, or his client relies on his promise to use greater skill and care.").

For these reasons, the Court grants Cafourek summary judgment as to Ma Amba's negligence claim.[7]

### III. ORDER

Based on the submissions and the entire file and proceedings herein, **IT IS HEREBY ORDERED** that Defendant Cafourek and Associates' Motion for Summary Judgment [Doc. No. 43] is **GRANTED**.

---

[7] Ma Amba also argues in passing that a reasonable juror could find that Cafourek breached its "ordinary" duty of care when it failed "to inform Ma Amba of the appropriate flood insurance coverage when Ma Amba first took over the flood policy on [the] Countryside Motel." (Pl.'s Opp. Br. at 16.) However, it has been clear since *Gabrielson* that, absent special circumstances, insurance agents have no "duty to initially inform the insured of the appropriate coverage." (*Id*. (citing pre-*Gabrielson* law).) In fact, the last published Minnesota legal decision to state that principle as a part of an insurance agent's "ordinary" duty of care was the Minnesota *Court of Appeals* decision in *Gabrielson*, which the Minnesota Supreme Court subsequently *overruled* because it unduly broadened the applicable standard of care. *See Gabrielson v. Warnemunde*, 430 N.W.2d 866, 869 (Minn. Ct. App. 1988), *rev'd*, 443 N.W.2d 540 (Minn. 1989).

What's more, in *Okrakene*, the Minnesota Court of Appeals expressly rejected the argument that "any agent, upon assuming agency duty, must at least talk to his or her new client and find out what their insurance needs are, and whether they are being met." *Okrakene*, 2008 WL 3897185, at *4. To the contrary, the appellate court ruled, "this proposition . . . runs contrary to the general rule than insurance agent 'has no legal duty toward an insured beyond that specifically undertaken by him or her.'" *Id*. (quoting *Johnson v. Farmers & Merchs. State Bank of Balaton*, 320 N.W.2d 892, 898 (Minn. 1982)).

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

Dated: May 1, 2019
s/Susan Richard Nelson
SUSAN RICHARD NELSON
United States District Judge